HELEN K. VREELAND, respondent,

*v.*

RICHARD M. VREELAND, appellant.

[Submitted December 5th, 1910.   Decided March 6th, 1911.]

. When the validity of a marriage is attacked upon the ground that one of the parties to it had a husband or a wife living at the time when it was contracted, the party asserting its invalidity must not only prove the former marriage, but also that the former husband or wife was living at the time of the contracting of the second marriage; and this latter fact is not proved by showing that the former husband or wife was alive at a time between three and four years prior to the solemnization of the second marriage.


On appeal from a decree of the court of chancery advised by Vice-Chancellor Howell.

*Mr. Peter W. Stagg,* for the appellant.

*Mr. Jerome D. Gedney,* for the respondent.

The opinion of the court was delivered by ·

GUMMERE, CHIEF-JUSTICE.

This is a suit for maintenance brought by the complainant under the statute, upon the ground that the defendant, her husband, has abandoned her without justifiable cause, and refuses and neglects to provide for her support. Two defences were interposed—*first,* that the complainant deserted her husband without cause and went to live with her mother; and *second,* that the marriage between the parties was void, because the complainant had another husband then living and from whom she had not been divorced. The complainant had a decree.

We concur in the view expressed by the learned vice-chancellor before whom the case was tried, that, upon the proofs submitted, the complainant is entitled to the relief which she seeks, unless her marriage to the defendant was shown to be void. The parties were married on the 15th of April, 1875, and two children were born to them, who are now living. It was proved in the case, and not denied, that a little more than four years before the complainant and the defendant were married, to wit, in March, 1871, she went through a marriage ceremony with one James McGinn, and that the marriage was solemnized by a priest of the Roman Catholic Church. She declared, however, upon the witness-stand, that, at the time this ceremony was performed, she was only eleven years old; that, in conducting it, the priest used the Latin language; and that she did not understand that she was being married to McGinn, but supposed that she was being "made a Catholic," that being what she was told by the priest and by McGinn. She also testified that she and McGinn separated immediately after the ceremony was performed, and that she never saw him afterward. The vice-chancellor accepted this story of the complainant as true, and held that as the marriage between her and McGinn had been contracted before she had reached the age of consent, it was null and void.

We are not at all convinced of the truth of the complainant's story with relation to her marriage with McGinn. The unlikelihood of a Roman Catholic priest being willing to perform a

17

marriage ceremony where one of the parties was a little girl of eleven years, without knowing whether or not it met with the approval of her parents or guardians, is apparent. Equally apparent is the improbability that he would be guilty of so gross a fraud as is charged against him in leading the child to believe that it was something other than a marriage ceremony which was being performed. We might, perhaps, be compelled to accept the complainant's testimony upon this point, notwithstanding its improbability, if she appeared in other respects to be an entirely credible and trustworthy witness. But this is not the fact. There is much in the proofs which affects unfavorably the credit to be accorded to her testimony, and she is directly contradicted by the defendant upon the matter of her age; for her marriage with him followed four years and one month after that with McGinn, and he testifies that she was then twenty or twenty-one years old. Moreover, we consider it significant that, although contradicted upon this vital point, the complainant made no effort to support her statement as to her age by other proof, notwithstanding that her mother was living with her at the time of the trial, and, presumably, better than anyone else could have proved the exact date of her birth. We conclude that the contention of the defendant that his marriage with the complainant was void cannot be decided adversely to him upon the ground that the marriage of the latter with McGinn was a nullity.

Assuming, then, that by the solemnization of the marriage between the complainant and McGinn she became his lawful wife, is that fact a bar to the relief which she seeks? It was proved in the case that in June, 1874, a suit for divorce was instituted in the superior court of Fairfield county in the State of Connecticut (a court of competent jurisdiction), in the name of the complainant and against James McGinn; and that such proceedings were had therein that, at its August term of that year, a decree was pronounced by the court divorcing the parties and adjudging the complainant to be single and unmarried. If full force and effect be given to this decree, the subsequent marriage of the complainant and defendant must, of course, be held to be entirely valid. The defendant, however, insists that it must be disregarded—*first*, because of the fact (which he

claims has been shown by the proofs) that neither the complainant nor McGinn were residents of the State of Connecticut at the time of the institution of the suit, or during its pendency; and *second,* because the suit was not instituted by the complainant, or by her authority, but by her mother and brother without her knowledge, as she herself stated on the witness-stand. Assuming, for the purpose of deciding the case, that the contention of the defendant must prevail, and the decree of the Connecticut court must be disregarded, what is the situation? There was no testimony, except hearsay, as to McGinn's being alive or dead at any time later than ten months after his marriage with the complainant. He may have been dead at the time of the marriage of the complainant with the defendant, or he may have been alive. What the fact is we are not shown. The law presumes a continuation of life until seven years have elapsed after a person has been last heard of, and if this presumption is accepted as equivalent to proof of the fact, the marriage of the complainant and defendant is void. Not only is it void, but it is bigamous, and the complainant is guilty of the crime of bigamy, the defendant has (unwittingly) committed the crime of adultery, and their children are bastards. But it is also a maxim of the law that every person shall be presumed innocent of a crime until proved guilty thereof; and if this presumption is to prevail, the complainant has not been guilty of the crime of bigamy, and the defendant has not been guilty of the crime of adultery. The law also presumes that children who have been born as the result of a ceremonial marriage are legitimate. *Sparks* v. *Ross, 75 N. J. Eq. (5 Buch.) 550, 552.* All of these latter presumptions are absolutely antagonistic to the presumption of the continuance of the life of McGinn. Which is to prevail? In the case of *Rex* v. *Twyning, 2 Barn. & Ald. 386* (an appeal from the quarter sessions court of Gloucester county), the court of kings bench had before it a similar problem for solution. Justice Bayley expressed himself upon the point as follows: "The law presumes the continuance of life, but it also presumes against the commission of crime, and that even in civil cases, until the contrary be proved. There was a marriage of Mary Burns with Francis Burns which is

*prima facie* valid, but the year before that took place she was the wife of Richard Winter, and if he was alive at the time of the second marriage it was illegal and she was guilty of bigamy. But are we to presume that Winter was then alive? If she had been indicted for bigamy it would clearly not be sufficient. In that case Winter must have been proved to have been alive at the time of the second marriage. It is contended that his death ought to have been proved, but the answer is that the presumption of law is that he was not alive, when the consequence of his being so is that another person has committed a criminal act. I think, therefore, that the sessions decided right in holding the second marriage to have been valid unless proof had been given that the first husband was alive at the time." Justice Best concurred, saying: "The sessions had a right to presume that the woman had not committed a crime, and, if so, the second marriage would be valid, unless proof had been given of the first husband being then alive. The cases cited are very distinguishable; they only decide that seven years after a person has been last heard of you are in all cases to presume his death. But they do not say that where conflicting presumptions exist, you may not presume the death at an earlier period. Now these presumptions exist here, and I think the sessions were warranted in presuming the death of the first husband on the ground that they would not presume that the woman had committed bigamy." *Rex* v. *Twyning* was approved and followed by the supreme court of Vermont in the case of *Greensboro* v. *Underhill, 12 Vt. 604.* In the later case of *Lapsley* v. *Grierson, 1 H. L. Cas. 498,* the case was commented upon and explained, but not overruled, Lord Campbell saying: "What is there said by Mr. Justice Bayley has been much misunderstood. He, who was one of the most learned, accurate and conscientious of judges, never laid down what in this argument has been attributed to him. All that he said was that there were presumptions of law on both sides, and that, as the quarter sessions had come to a conclusion upon the facts, the court of kings bench would not say that in fact they had come to a wrong conclusion." With due despect to the learning and acumen of Lord Campbell, we cannot agree with him in the construction which he puts upon

the language of Mr. Justice Bayley. The declaration of the latter that "the presumption of law is that he (the first husband) was not alive, when the consequence of his being so is that another person has committed a criminal act," seems to us hardly equivalent to saying that as the quarter sessions had come to a conclusion upon the facts the court of kings bench would not say that its conclusion was wrong. As we read the *Twyning Case,* it establishes the proposition that where a marriage is solemnized between a man and woman it is *prima facie* valid, and (inferentially) that issue born of that marriage is *prima facie* legitimate; and, further, that when the validity of the marriage is attacked upon the ground that one of the parties to it had a husband or wife living at the time it was contracted, the party asserting its invalidity must not only prove the former marriage, but also that the former husband or wife was then living; and that such fact is not proved by showing that the former husband or wife was alive at a time less than seven years previous to the time of the second marriage. To this extent we consider the decision logically sound; that it establishes a wise public policy tending to safeguard the rights of children after the death of their parents, and when their ability to prove their legitimacy may be difficult, and makes more secure and stable property rights which descend to the heirs and next of kin, devisees and legatees of decedents. It further holds that, at the expiration of twelve months after the former husband or wife has been last heard of, the presumption that he or she is still alive ceases to be strong enough to overcome the antagonistic presumptions of the validity of the second marriage, the legitimacy of the issue resulting from it, and the innocence of crime on the part of the persons contracting it. It cannot be disputed that the presumption of continuing life grows weaker as time passes. It is stronger the day after a person disappears than it is a year after. Stronger after the expiration of a year than at the end of two years. Stronger then than at the expiration of five or six years. At the end of seven years it has become so attenuated that the law terminates its existence. Whether the judges who decided *Rex* v. *Twyning* were right in considering that this presumption has become so weakened after the lapse

of twelve months as to be compelled to give way to the conflicting presumptions therein recited, is a question not involved in the determination of the present case; for here the time which had elapsed between the disappearance of McGinn and the marriage of the complainant and defendant was between three and four years. We think that after the expiration of that period of time the presumption that he was still living had become so reduced in strength as to be overcome by those to which it was opposed, and that consequently the defendant has failed to establish his contention that the complainant had a husband living at the time of her marriage to him.

The decree appealed from will be affirmed.

GARRISON, J. (concurring).

I concur in the opinion of the chief-justice.

In *Bower* v. *Bower,* *78 N. J. Law* (*49 Vr.*) *387,* we pointed out that the fundamental characteristic of a presumption was that it affected the duty of producing further proof. Under this rule, the presumption, in the present case, in favor of innocence and legitimacy, cast upon the defendant, who was in effect asserting his own guilt and that of the complainant and the illegitimacy of their offspring, the duty of producing proof that should meet and overcome such presumption. This, as pointed out by the chief-justice, he did not do. It is not a question of what inferences of fact might logically be indulged in, but of a rule of law and of the defendant's failure to bring his case with it, and such failure is not cured or helped by the common law rule as to the presumption of death or by our statutory substitute therefor.

*For affirmance*—THE CHIEF-JUSTICE, GARRISON, SWAYZE, REED, TRENCHARD, PARKER, BERGEN, VOORHEES, MINTURN, BOGERT, VREDENBURGH, VROOM, CONGDON, SULLIVAN—14.

*For reversal*—None.