***********
The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Holmes and the briefs and arguments of the parties. The appealing party has not shown good ground to reconsider the evidence, receive further evidence, rehear the parties or their representatives, or amend the Opinion and Award except for minor modifications.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. At the time of the alleged injury giving rise to this claim, the parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act. *Page 2 
2. At such time, an employee-employer relationship existed between Anthony R. Thompson (hereinafter "decedent") and defendant-employer.
3. St. Paul Travelers was the carrier on the risk for defendant-employer.
4. Decedent's average weekly wage was $420.00, which produced a compensation rate of $280.02.
5. Decedent sustained an injury on June 5, 2002, which arose out of and in the course of employment and is compensable.
6. Decedent's cause of death was Methadone toxicity.
7. Decedent was not prescribed any Methadone by any of his authorized treating physicians.
 ***********
Based upon all of the competent evidence of record and reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. Decedent suffered a compensable injury to his lower back on June 5, 2002.
2. Defendants accepted the June 5, 2002 injury as compensable via a Form 60.
3. Defendants provided decedent with all medical and indemnity benefits until his death on November 21, 2003.
4. Plaintiff met decedent through his sister, Candace Thompson, who lived with plaintiff beginning in June or July 2000. Prior to June or July 2000, plaintiff lived in the apartment by herself. Plaintiff's rent was based upon the income of the occupants such that when plaintiff lived by herself she paid less rent than when she had roommates. *Page 3 
5. Candace Thompson lived with plaintiff for about four months and then moved out. Candace Thompson moved back into plaintiff's apartment about a year later.
6. Plaintiff lived alone in the apartment and supported herself during the year that Candace Thompson did not live with her.
7. Decedent moved in with plaintiff and his sister in November 2001. Candace Thompson moved out of the apartment in February 2002.
8. Plaintiff and decedent began a romantic relationship in December 2001. They became engaged to be married in the spring of 2002. Plaintiff and decedent lived together in plaintiff's apartment from November 2001 until his death in November 2003. During that time, they shared living expenses such as rent and utilities. Prior to decedent's injury, plaintiff and decedent had separate checking accounts. After his injury, plaintiff and decedent opened a joint checking account. Plaintiff testified that the rent was between $95 and $125 a month during the time that decedent lived with her.
9. Plaintiff received monthly Social Security disability income of approximately $565.00 a month. Based on the testimony of Candace Thompson and decedent's father, Joe Thompson, the Full Commission finds that plaintiff also worked "side" jobs as a babysitter, at a pipe cleaning company, and a consignment store.
10. In late 2003, plaintiff and decedent decided that decedent's father would move to Wilmington to live with decedent and plaintiff would move back in with her parents.
11. On or around November 20, 2003, decedent traveled to Sherrills Ford, NC to help his father move with him to Wilmington. Prior to traveling to Sherrills Ford, decedent had a doctor's appointment with Dr. Curlee, whereby Dr. Curlee wrote a prescription to refill *Page 4 
decedent's pain medication. Decedent's prescriptions were refilled by Dr. Curlee on November 13, 2003 and were available for pick-up.
12. Decedent did not pick up his medications prior to traveling to Sherrills Ford. When Joe Thompson asked decedent if he would be okay without refilling the prescriptions, decedent's response was "I'll be alright. It's okay."
13. Decedent voluntarily chose to travel to Sherrills Ford without picking up his prescription pain medication.
14. On November 20, 2003, Joe Thompson gave decedent the drug Methadone, which had been prescribed to Joe Thompson for pain, because decedent did not have his pain medication with him. He gave decedent two five milligram pills in the afternoon and two five milligram pills at about eight o'clock that night. Joe Thompson testified that he and decedent were "laughing and cutting up" that evening. At about two o'clock in the morning decedent asked for two more Methadone pills to go to sleep and Joe Thompson gave his son two more five milligram pills of Methadone. At some point in the evening, decedent told plaintiff by telephone that he had taken his father's Methadone to "take the edge off so he could get a good night's sleep."
15. Decedent died in the early morning hours of November 21, 2003. The cause of death was Methadone toxicity.
16. Joe Thompson did not intend to harm his son by giving him Methadone and, given his son's size, he did not think the amount of Methadone he gave him would harm him.
17. Plaintiff and Joe Thompson testified that they did not believe that decedent intended to harm himself or overdose on Methadone. Decedent never told plaintiff he was considering killing himself or that he wished he would die. Joe Thompson handed his son the *Page 5 
pills and the rest of the pills were accounted for. Thus, by inference decedent did not go back and take additional pills without his father's knowledge. The overdose was accidental. Decedent did not commit suicide
18. None of decedent's physicians prescribed Methadone and when decedent took his father's Methadone it was without a prescription and illegal.
19. Decedent was not married and did not have any children.
20. Plaintiff failed to prove by the greater weight of the testimony and evidence that she was wholly or partially dependent upon decedent at the time of his June 5, 2002 injury or at his death.
21. Decedent was survived by his mother, father, and sister.
22. Dr. Curlee assigned a 10% permanent impairment rating to decedent's back on January 14, 2004.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission reaches the following:
 CONCLUSIONS OF LAW
1. N.C. Gen. Stat. § 97-12 states that "no compensation shall be payable if the injury or death to the employee was proximately caused by . . . his being under the influence of any controlled substance listed in the North Carolina Controlled Substances Act, N.C. Gen. Stat. §90-86, et seq., where such controlled substance was not by prescription by a practitioner." N.C. Gen. Stat. § 97-12(2). Methadone is listed as a Schedule II controlled substance under N.C. Gen. Stat. § 90-90(2)(o). No medical provider prescribed decedent Methadone and decedent took the *Page 6 
Methadone illegally. As such, N.C. Gen. Stat. § 97-12 precludes any compensation, including death benefits, being owed or payable on account of decedent's Methadone overdose.
2. Persons wholly dependent on the earnings of decedent at the time of the accident shall be entitled to receive the entire compensation, payable share and share alike, to the exclusion of all other persons. N.C. Gen. Stat. § 97-38(1). A widow, widower, and/or a child shall be conclusively presumed to be a dependent of decedent and wholly dependent on decedent for support. In other cases where a question as to dependency arises, in whole or in part, it shall be determined in accordance with the facts at the time of the accident. N.C. Gen. Stat. § 97-39. In the case at hand, the greater weight of the evidence fails to show that plaintiff was wholly or partially dependent upon decedent.
3. Assuming arguendo, that decedent's death by Methadone toxicity was compensable and that plaintiff was wholly or partially dependent upon decedent, plaintiff is ineligible to receive compensation as a result of decedent's death as she is not related to decedent. Instead, Joe Thompson and Renee Thompson, decedent's father and mother, respectively, would take in equal shares as next of kin. N.C. Gen. Stat. §§ 97-38,97-40, 29-15, Fields v. Hollowell Hollowell, 238 N.C. 614,78 S.E.2d 740 (1953); Shealy v. Associated Transport, Inc., 252 N.C. 738,114 S.E.2d 702 (1960).
4. As next of kin, Joe Thompson and Renee Thompson, decedent's father and mother, respectively, are entitled to payment for decedent's 10% permanent impairment rating, in equal shares pursuant to N.C. Gen. Stat. § 97-37.
5. No evidence was presented to show nonpayment of any medical bills by defendants related to the June 5, 2002 injury. The Methadone overdose was unrelated and non- *Page 7 
compensable under the Act, and defendants are not responsible for any medical bills paid in relation to decedent's death, or for any funeral expenses.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the undersigned enter the following:
 AWARD
1. Plaintiffs' claim for death benefits is hereby DENIED.
2. Plaintiffs' claim for payment of permanent partial disability rating is hereby DENIED.
3. Defendants shall pay in equal shares to Mr. Joe Thompson, father of the deceased, and Ms. Renee Thompson, mother of the deceased, for decedent's 10% impairment rating to the back.
4. Plaintiffs' claim for funeral expenses is hereby DENIED.
5. Plaintiffs shall pay the costs.
This the 16th day of August 2007.
S/________________________ DIANNE C. SELLERS COMMISSIONER
CONCURRING:
 S/________________________ DANNY LEE McDONALD COMMISSIONER
 S/________________________ LAURA KRANIFELD MAVRETIC COMMISSIONER *Page 1